UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

DEBORAH  RAKESTRAU                      CIVIL ACTION NO. 11-CV-1762

VERSUS

MICHAELW. NEUSTROM, ET AL            MAGISTRATE JUDGE HANNA

### MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment based on Qualified Immunity

filed by Defendant Chris Guidry. [Doc. 33]   After considering the filings of the parties and

the arguments presented by each, and for the reasons set out herein, the motion is GRANTED

IN PART and DENIED IN PART.

### Background

This action arises out of an October 4, 2010 incident in which Lafayette Parish

Sheriff's Deputy Chris Guidry tasered Javon Rakestrau who subsequently died. The

claims are brought by Rakestrau's mother against Guidry individually and in his official

capacity under 42 U.S.C. §1983 and state law.  Municipal liability has been asserted

against Sheriff Neustrom in his official capacity.  The plaintiff contends that the use of

the taser by Guidry was excessive under the circumstances and violated her son's

constitutional rights to be free from unreasonable seizure/arrest and the excessive use of

force as guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the

United States.  Guidry argues that his actions were objectively reasonable under the

circumstances presented entitling him to qualified immunity.

At the time of the incident, Guidry was a member of a narcotics task force operating in a neighborhood which law enforcement officials, including Guidry, believed to be a violent, high-crime, high drug use area. Guidry was in uniform in a marked patrol unit.  He was alerted by an undercover agent of an individual matching the description of Rakestrau having engaged in what was suspected to be a hand to hand narcotics deal. Guidry activated his dashboard video camera and drove to the street where Rakestrau was walking. The majority of Guidry's interaction with Rakestrau, which lasts less than a minute, is captured on video complete with audio. The video was entered into the record, and the following facts are taken solely from that evidence.

Guidry observed the suspect, Rakestrau, walking on the sidewalk and brought the unit to a stop just in front of him. Guidry exited his vehicle and called in Rakestrau's description over the radio. Guidry told Rakestrau "come here, man, how's it going?" Rakestrau stopped but did not completely comply.  Guidry asked for identification. Rakestrau said it was at his house and attempted to walk away.  Guidry said "No, no, no, no, come here" then grabbed  Rakestrau's jacket arm, pulled him to the front of the unit and said "put your  hands on the f___ing hood" while Rakestrau continued to protest that his identification was at his house. Rakestrau initially complied with the command to put his hands on the hood but immediately removed his hands, turned with his cell phone in his right hand to Guidry, who was standing behind him and to his right, and said

-2-

repeatedly in an increasingly louder voice "I'm calling the law myself, my dog" as he tried to dial the phone.  Guidry requested another police unit from his shoulder mounted radio. As Rakestrau tried to use his cell phone with his right hand, he can be seen taking something from his left jacket pocket with his left hand out of the sight of Guidry who was trying to wrest the cell phone away. Guidry took the cell phone from Rakestrau and dropped it to the ground.  Guidry then stood behind Rakestrau and forced him to put his hands on the hood of the car.  At that point Rakestrau began loudly yelling "hey, hey." He tensed up and pushed his right side toward Guidry continuing to yell loudly.

In response to Rakestrau's resistance, Guidry used an arm-bar takedown to take Rakestrau to the ground where both men are partially out of the video camera view. It can be seen that Guidry got Rakestrau down to the ground and there was a struggle on the ground, with Rakestrau yelling "Mama" among other things.   Rakestrau escaped from Guidry's hold, got to his feet and  pulled away from Guidry. When Guidry tried to grab him by his jacket, Rakestrau came out of his jacket and took a couple of steps away from Guidry in what appears to be an effort to flee. Guidry pursued him and Rakestrau turned toward Guidry with both of  his hands visible in a position Guidry interpreted as a fighting stance.  Guidry drew his taser and aimed it at Rakestrau who commented "Now you f—ing tasing me."  Guidry told Rakestrau that he was tasing him as he applied the taser.

Rakestrau "locked up" and fell to the ground out of view of the camera.  There is

-3-

no dispute that after the first taser application, Rakestrau fell immediately to the ground, face-down. The taser can be heard to cycle for seven seconds and during the cycle Guidry commands Rakestrau to put his hands behind his back but there was no compliance, possibly because Rakestrau was incapacitated at the time of the command.  There is a pause in the taser cycle and Guidry again commands Rakestrau to put his hands behind his back at the same time Rakestrau asks "why are you f_____ing tasing me." Immediately, Guidry discharges the taser a second time for nine seconds. Rakestrau can be heard gurgling, but from that point on he does not speak nor is there any sign of movement visible on the camera. A second unit arrives shortly thereafter at which point Rakestrau is essentially unresponsive. Efforts to revive him were unsuccessful.

There was a four second pause between the two taser discharges. Taser records indicate that the first discharge lasted seven seconds and the second lasted nine seconds. The device issued by LPSO is the X26 Advanced Taser.   In order for the current from the taser not to stop after it completes its five second cycle, the trigger must be continually depressed. Guidry's explanation for his decision to discharge his taser a second time is that he saw Rakestrau roll onto his side and move his hand toward his middle.  Guidry testified he was concerned that the movement may break the taser wires and eliminate the taser as a means of control or that Rakestrau may be "going for a weapon."

LPSO has a detailed written policy/procedure for the use and handling of electronic control devices, which are viewed as intermediate weapons on the LPSO Use

of Force Continuum. Per the policy, the device:

> may be used to control dangerous or violent subjects when deadly physical force does not appear to be justified and/or necessary; or attempts to subdue the subject by other conventional tactics have been, or will likely be, ineffective in the situation; or there is reasonable expectation that it will be unsafe for an officer to approach within contact range of the subject.

> D.(4) Once the Electronic Control Device is discharged and contacts the target, the Electronic Control Device should be allowed to complete its initial five-second discharge.
> > a. Verbal commands shall be given to the suspect while attempting to gain compliance.
> > b. Additional discharges may be used to gain compliance.

While Rakestrau was on the ground after the first tasing, he was out of view of the camera.  The plaintiff offered testimony of two bystander witnesses, Scotty Thomas and Corey Francis.  Thomas confirmed that when he first saw Rakestrau and Guidry, they "was tussling" on the ground.  After the first taser application, he saw Rakestrau fall to the ground.  Thomas saw no further movement and heard nothing from Rakestrau. Francis saw Rakestrau fall "super hard," like "dead weight" and never move again.  His hands were under him. Both witnesses heard the officer direct Rakestrau to put his hands behind his back.

### *Applicable Law and Analysis*

Section 1983 provides a remedy against "every person," who under color of state law, deprives another of any rights secured by the Constitution and laws of the United States. 42 U.S.C. § 1983; *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct.

2018 (1978).  Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating federal rights conferred elsewhere. *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir.1999).  To pursue a claim under § 1983, a plaintiff must: (1) allege a violation of rights secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Southwestern Bell Telephone, LP v. City of Houston*, 529 F.3d 257, 260 (5th Cir.2008); *see also West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 2254–55 (1988).  There is no dispute that Guidry acted under color of law.

Whenever an officer restrains the freedom of a person to walk away, he has seized that person. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578 (1975).  To determine the constitutionality of a seizure the court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642 (1983); *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 1699 (1985). A "seizure" triggering the Fourth Amendment occurs whenever government actors have, "by means of physical force or show of authority, ... in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1879 n. 16. (1968).

It is well-settled that police officers may stop and briefly detain an individual for investigative purposes if they have reasonable suspicion that criminal activity is afoot.

*Terry v. Ohio*, 392 U.S. 30, 88 S.Ct. 1884.  "Reasonable suspicion must be supported by particular and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant an intrusion." *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994).  The "presence or absence of reasonable suspicion must be determined in light of the totality of the circumstances confronting a police officer, including all information available to the officer at the time of the decision to stop a person." *United States v. Silva*, 957 F.2d 157, 160 (5th Cir. 1992).

The record demonstrates that an undercover agent had observed Rakestrau engage in a "hand to hand" exchange with a person believed to be a drug dealer.  The agent directed  Guidry to Rakestrau's location by radio and provided a physical description to Guidry.  These facts support a reasonable suspicion to justify a stop for investigative purposes. The plaintiff does not challenge the reasonableness of the stop.  Rather the focus of the plaintiff's claim is that the use of the taser after the stop was excessive.

Claims of "excessive force implicate the Fourth Amendment's proscription against unreasonable seizures." *Peterson v. City of Fort Worth*, 588 F.3d 838, 845 (5th Cir.2009) (*citing Terry v. Ohio*, 392 U.S. 16, n. 16). " [A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871 (1989). "Because the Fourth

Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Id.*

To prevail on a Fourth Amendment excessive force claim, a plaintiff must establish "(1) injury (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007) quoting *Tarver v. City of Edna,* 410 F.3d 745, 751 (5th Cir. 2005) and *Goodson v. City of Corpus Christi,* 202 F.3d 730, 740 (5th Cir. 2000).  A plaintiff must show that the use of force was "clearly excessive to the need and was objectively unreasonable," *Hill v. Carroll County*, 587 F.3d 230, 234 (5th Cir.2009). A determination of whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the amount of force used against the need for force.  *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008).  As stated by the Supreme Court:

> Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

> The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.

*Graham v. Connor*, 490 U.S. 396–397, 109 S.Ct. 1871-1872. (emphasis added; internal quotations and citations omitted).

"Excessive force claims are necessarily fact-intensive; whether force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case. '"*Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) quoting *Graham* v. *Connor*, 490 U.S. 396.   Where, as here, the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that there is insufficient proof concerning an essential element of the nonmoving party's claim.  *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008).  "The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists." *Id.*  As the Fifth Circuit has stated:

> [The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence.  We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of

> contradictory facts.  We do not, however, in the absence of any proof,
> assume that the nonmoving party could or would prove the necessary facts.
> ...[S]ummary judgment is appropriate in any case where critical evidence is
> so weak or tenuous on an essential fact that it could not support a judgment
> in favor of the nonmovant.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citations and

emphasis omitted).

In evaluating evidence to determine whether a factual dispute exists, credibility

determinations or weighing evidence is not part of the analysis.  *Roberts v. Cardinal*

*Services*, *Inc.*, 266 F.3d 368, 373 (5th Cir. 2001).  To the contrary, in reviewing all the

evidence, the court must disregard all evidence favorable to the moving party that the jury

is not required to believe, and should give credence to the evidence favoring the

nonmoving party, as well as that evidence supporting the moving party that is

uncontroverted and unimpeached. *Id*.

However, the determination of the facts at issue in this case can largely be derived

from the video recording.  The facts taken from the video recordings taken at the scene

are to be given greater weight even at the summary judgment stage. *Carnaby v. City of*

*Houston*, 636 F.3d 183, 187 (5th Cir. 2011); *Poole v. City of Shreveport,* 691 F.3d 624,

627 (5th Cir. 2012).  When the plaintiff's description of the facts is discredited by that

record, the court properly considers "the facts in the light depicted  by the videotape." *Id.,*

quoting  *Scott v. Harris*, 550 U.S. 372, 381, 127 S.Ct. 1769 (2007).  Nonetheless, the

video must be viewed by the court from the perspective of a reasonable officer.  *Foster v.*

*Carroll County*, 2012 WL 5398190, *2 (5th Cir. 11/6/12). Thus, this court's analysis will focus to the extent possible on the factual scenario depicted on the recording from Guidry's dashboard camera since that record depicts the only interaction between Guidry and Rakestrau.

At this stage, the defendant does not contest that Rakestrau suffered injury during his interaction with Guidry from the use of the taser.  However, this Court finds that the decisions and actions of Guidry up to and including the first discharge of his taser were not excessive to the need or objectively unreasonable under the circumstances presented to him. The video establishes that when their paths crossed, Rakestrau and Guidry were alone in an area that was the focus of criminal task force operations. Guidry was directed to Rakestrau by an undercover agent who had seen Rakestrau engage in a suspected drug buy.  The video clearly demonstrates the rapid escalation of force.  Within seconds, Guidry's verbal directives to Rakestrau were ineffective, and the effort to guide Rakestrau to the front of his vehicle for pat-down were verbally and physically resisted by Rakestrau. The video demonstrates Rakestrau's near-constant evasive movements, verbal protestations, his breakaway from Guidry's takedown maneuver, and the attempt at flight thereafter.  None of the actions on the lower level of the LPSO-authorized force continuum[1] were effective in gaining compliance or control.  Guidry had been unable to

---

[1]LPSO policy documents described the Continuum of Force to move from officer presence to verbal commands, to empty hand control (soft, hard), to intermediate weapons, to deadly force.  LPSO policy#301, at p. LPSO502

search Rakestrau for a weapon.  Guidry could not rule out that the uncooperative and actively resistant Rakestrau may have been armed or under the influence of drugs. During the fast-developing situation facing Guidry (less than 30 seconds), described in detail from his perspective in his affidavit and depicted in real time on the video recording from the dashboard camera, Guidry decided to use his taser in the effort to stop and search Rakestrau without drawing his firearm. Rakestrau was taller and had a reach advantage over Guidry which made use of a baton or hands less desirable alternatives, particularly given the inability to successfully take Rakestrau down and restrain him from an advantageous position.  The use of the taser from a distance could allow Guidry to gain control over Rakestrau and avoid the risks associated with a closer hand-to-hand confrontation.

Despite Plaintiff's arguments in brief to the contrary, the use of tasers is not comparable to the discharge of a firearm, and tasers are not considered deadly force in the Fifth Circuit, even in cases where the subject died following a tasing incident.  *Batiste v. Theriot*, 458 Fed. Appx. 351, 354 (5th Cir. 2012).  Arguments that Guidry may have been under the influence of steroids at the time of the incident or may have forged his training records fail in the context of the 'objectively reasonable' analysis. If an action is "objectively reasonable" it is so *"whatever* the subjective intent" was of the official. *Ashcroft v. al-Kidd,* 563 U.S. ----, 131 S.Ct. 2074, 2080, (2011) quoting *Whren v. United States*, 517 U.S. 806, 814 (1996) (emphasis in original).  Such factors will not convert an

objectively reasonable use of force into a Fourth Amendment violation. *Poole v. City of Shreveport*, 691 F.3d at 628.

In considering the fast-developing events and the directives set out in *Graham* that the court must avoid substituting personal notions of proper police procedure for the instantaneous decision of the officer at the scene, this Court finds that the  actions up to and including the first taser application do not constitute force that was excessive to the need or objectively unreasonable. Therefore, there is no constitutional violation and the Motion for Summary Judgment is granted on that basis as to the events leading up to and including the first taser application.

The second taser application by Guidry warrants further analysis since the actions of Rakestrau are not depicted on the video, and since Guidry's description of Rakestrau's actions are disputed and contradicted by the testimony of other witnesses on the scene at the time of the second tasing. While arguments by a nonmovant which amount to conjecture do not raise genuine issues of material fact in an excessive force case, discrepancies between an officer's version of events and the accounts of disinterested eyewitnesses may be sufficient to justify a denial of summary judgment. *Bazan v. Hidalgo County*, 246 F.3d 481, 491-492 (5th Cir. 2001).

 As to the second taser discharge, the policy of the LPSO is that repeat taser discharges may be utilized to "gain compliance."  Two eyewitnesses testified Rakestrau did not move after the first taser discharge. It is undisputed Rakestrau was face down on

the ground, even though his hands were under him.  Prior to the first taser discharge, Rakestrau's hands are clearly visible and there is no weapon in either one of them. His jacket had been removed and he was wearing only a t-shirt which could not conceal a weapon. His pants were sagging such that there was no visible evidence of a weapon in the front, and presumably, given the position of his pants, there was no visible weapon in the back although the possibility of him having a weapon in his pants or pants pockets cannot be completely ruled out.  Before the second taser discharge, Guidry gave two commands for Rakestrau to put his hands behind his back. One was while the first taser cycle was still ongoing. Presumably, it is not possible to move one's hands until after the discharge stops. There is a pause and the second command is given at the same time Rakestrau asks why he is being tased. Immediately after the command is given, the second discharge is applied. One cannot tell from the video if Rakestrau is fully subdued before the taser is applied or if he was given ample opportunity to comply with the commands of Guidry. Further, the cycle lasts five seconds unless the trigger is continually depressed. The cycle in the video lasted nine seconds which would indicate the trigger was continually depressed beyond the normal five second cycle.

As set forth more fully below, it is possible for an excessive force constitutional violation to arise in certain circumstances when a taser is used. This Court finds there exists a material issue of fact in dispute regarding the reasonableness of Guidry's conduct as to the second taser discharge which precludes summary judgment on the issue of

whether excessive force was used, and therefore, whether there was a constitutional violation. However, that does not preclude consideration of the qualified immunity defense as this defense is distinct from the merits of an excessive force claim. *Saucier v. Katz*, 533 U.S. 194, 204, 121 S.Ct. 2151, 2158 (2001).

A qualified immunity defense alters the usual summary judgment burden of proof. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) citing *Michalik v. Hermann*, 422 F,3d 252, 262 (5th Cir. 2005). "When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *Club Retro, LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir.2009) citing *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir.2002) (*en banc*). In order to overcome the defense of qualified immunity at the summary judgment stage, the plaintiff cannot rest on conclusory allegations or assertions but must demonstrate genuine issues of material fact regarding the reasonableness of the defendant's conduct. *Michalik v. Hermann*, 422 F.3d at 262. To discharge this burden, a plaintiff must satisfy a two-prong test. He must allege (or show) to the satisfaction of the court that the defendant has violated a constitutional right.  If so, he must also show that the defendants' actions were objectively unreasonable in light of the law that was *clearly established* at the time of the actions that are the subject of the complaint.  *Atteberry v. Nocona Gen'l Hosp.*, 430 F.3d 245, 253 (5th Cir.2005) (emphasis added); *see also Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir.2007).

In *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808 (2009), the Supreme Court

revised the rule of *Saucier v. Katz* and held that in resolving a qualified immunity claim, while it may be beneficial to do so in some cases, courts need not first determine whether facts alleged or shown by the plaintiff make out a violation of a constitutional right. The sequence of the two-prong analysis is not mandatory, and courts may exercise discretion in deciding which of the two prongs should be addressed first. *Id.* 555 U.S. 226, 129 S.Ct. 818. Since this Court cannot conclude as a matter of law whether a constitutional right was violated, the analysis must turn to whether Guidry's actions were objectively unreasonable in light of the law that was clearly established at the time of his actions.

The Supreme Court provided the analytical distinction in *Saucier v. Katz:*

The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Graham* does not always give a clear answer as to whether a particular application of force will be deemed excessive by the courts. This is the nature of a test which must accommodate limitless factual circumstances. This reality serves to refute respondent's claimed distinction between excessive force and other Fourth Amendment contexts; in both spheres the law must be elaborated from case to case. Qualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes "hazy border between excessive and acceptable force," *Priester v. Riviera Beach*, 208 F.3d 919, 926-927 (C.A.11 2000), and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.

> *Graham* and *Anderson* refute the excessive force/probable cause distinction
> on which much of respondent's position seems to depend. The deference
> owed officers facing suits for alleged excessive force is not different in
> some qualitative respect from the probable-cause inquiry in *Anderson*.
> Officers can have reasonable, but mistaken, beliefs as to the facts
> establishing the existence of probable cause or exigent circumstances, for
> example, and in those situations courts will not hold that they have violated
> the Constitution. Yet, even if a court were to hold that the officer violated
> the Fourth Amendment by conducting an unreasonable, warrantless search,
> *Anderson* still operates to grant officers immunity for reasonable mistakes
> as to the legality of their actions. The same analysis is applicable in
> excessive force cases, where in addition to the deference officers receive on
> the underlying constitutional claim, qualified immunity can apply in the
> event the mistaken belief was reasonable . . .Excessive force claims, like
> most other Fourth Amendment issues, are evaluated for objective
> reasonableness based upon the information the officers had when the
> conduct occurred . . . The question [for purposes of qualified immunity] is
> what the officer reasonably understood his powers and responsibilities to
> be, when he acted, under clearly established standards.

*Saucier v. Katz*, 533 U.S. 205-208, 121 S.Ct. 2158-2159.

"A government official's conduct violates clearly established law when, at the time

of the challenged conduct, 'the contours of [a] right [are] sufficiently clear' that *every*

'reasonable official would have understood that what he is doing violates that right'. . .

We do not require a case directly on point, but existing precedent must have placed the

statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd,* 563 U.S.----, 131

S.Ct. 2074, 2083 (2011) quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct.

3034, 3039 (1987) (emphasis added).  The fact that it is clear that any unreasonable use of

force is unconstitutional does not mean that it is always clear which uses of force are

unreasonable.  The "right allegedly violated must be defined at the appropriate level of

-17-

specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 1700 (1999).  Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity ...into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson v. Creighton*, 483 U.S.  639, 107 S.Ct. 3039.  "If the law at the time of a constitutional violation does not give the officer 'fair notice' that his conduct is unlawful, the officer is immune from suit. This standard thus protects an officer with a mistaken, yet reasonable, understanding of the law from the 'hazy border between excessive and acceptable force*.'" Manis v. Lawson,* 585 F.3d 839, 846 (5th Cir. 2009) citing  *Brousseau v. Haugen*, 543 U.S.194, 198-201, 125 S.Ct. 566, 599, (2004); *Saucier v. Katz*, 533 U.S. 194, 206.  In the qualified immunity context, the objective reasonableness of an officer's belief that his conduct was lawful is a question of law, not fact. *Atteberry v. Nocona General Hospital*, 430 F.3d at 256.

In *Williams v. City of Cleveland, Ms.* 2012 WL 3614418 (N.D. Miss. 8/21/2012), the court collected the case law on a national basis along with some outside sources pertaining to the use of tasers. The jurisprudence addressing taser use in excessive force claims generally falls into two categories.  The first involves individuals over whom officers have not obtained control and are tasered while actively resisting arrest by

physically struggling with, threatening, or disobeying officers.[2]  In such cases courts conclude either that no constitutional violation occurred, or that the right not to be tasered while resisting arrest was not clearly established at the time of the incident thus entitling the officer to qualified immunity. The cases from the Fifth Circuit follow the same pattern. *Poole v. City of Shreveport*, 691 F.3d 629 (summary judgment granted to officers who responded with "measured and ascending" actions, including taser use, which corresponded to the plaintiff's escalating verbal and physical resistance in a "tense, uncertain, and rapidly evolving" situation); *Batiste v. Theriot*, 458 Fed. Appx. 355-356, (reversing denial of summary judgment on finding that it is reasonable for officers to chase and taser a fleeing suspect with a felony arrest warrant, even if the tasing caused

---

[2]  *Buchanan v. Gulfport Police Department*, 2012 WL 1906523 at *9 (S.D. Miss. 5/25/2012); *Cockrell v. City of Cincinnati*, 468 Fed. Appx. 491, 496-498 (6th Cir. 2012) (the right of a misdemeanant, fleeing from the scene of a non-violent misdemeanor, but offering no other resistance and disobeying no official command not to be tased, even if excessive, was not clearly established in 2008); *Mattos v. Agarano*, 661 F.3d 433, 433 (9th Cir.2010); *McKenney v. Harrison*, 635 F.3d 354 (8th Cir.2011); *Bryan v. MacPherson*, 630 F.3d 805, 805 (9th Cir.2009); *Isom v. Town of Warren, R.I.,* 360 F.3d 7,12 (1st Cir. 2004);  *Baird v. Ehlers*, 2011 WL 5838431 (W.D.Wash. Nov. 21, 2011); *McConnell v. McKillip,* 573 F.Supp.2d 1090, 1101 (S.D. Ind. 2008); *Stanley v. City of Baytown,* 2005 WL 2757370 at *8 (S.D. Tx. 10/25/05); *Carter v. City of Carlsbad*, 2011 WL 2601027 (S.D. Cal. June 30, 2011); *Azevedo v. City of Fresno*, 2011 WL 284637 (E.D.Cal. Jan. 25, 2011); *Sanders v. City of Dothan*, 671 F.Supp.2d 1263 (M.D.Ala.2009); *Beaver v. City of Federal Way*, 507 F.Supp.2d 1137 (W.D.Wash.2007) (holding that, of five August 2004 taser deployments against suspect who fled scene of residential burglary and refused to obey command to stop, first three were not excessive uses of force, since officer had to make split-second decisions on how to subdue disobedient, fleeing felon, while last two constituted excessive force because suspect was no longer immediate threat; qualified immunity still was appropriate, however, because law was not clearly established).

death).  Many courts, including the Fifth Circuit, have upheld the use of even deadly force by police officers when suspects refuse to obey commands regarding the placement of their hands.  *See e.g. Carnaby v. City of Houston,* 636 F.3d 188-189, (upholding use of deadly force against suspect whose actions could reasonably be interpreted as reaching for a weapon). This includes the use of taser guns and pepper spray.  *See, e.g. Brewer v. Texas*, 2011 WL 3047647 (N.D.Tex. Jul. 22, 2011) (use of taser device was not an unreasonable attempt to subdue plaintiff who repeatedly ignored instructions by police to show his hands).

The second group involves a law enforcement official tasering an individual who had done nothing to resist arrest or was already detained and had been subdued.[3]   In the second group, courts have almost uniformly held that a §1983 excessive force claim is available and this circuit is consistent in that regard as well.  *Autin v. Baytown,* 174 Fed. Appx. 183, 185-186 (5th Cir. 2005) (unpublished) (denial of summary judgment in multiple tasering case where plaintiff was at most committing the minor crime of criminal mischief, was not a threat to the officer or others, and was not resisting arrest); *Massey v. Wharton*, 477 Fed. Appx. 256, 263 (5th Cir. 2012) (unpublished) (denial of qualified

---

[3] *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir.2010); *Brown v. City of Golden Valley*, 574 F.3d 491, 499-500 (8th Cir.2009); *Landis v. Baker*, 297 F. App'x 453, 462 (6th Cir.2008); *Casey v. City of Federal Heights*, 509 F.3d 1278, 1283-1285 (10th Cir. 2007); *Shekleton v. Eichenberger*, 2011 WL 1578421 at *10 (N.D.Iowa Apr.26, 2011); *Borton v. City of Dothan*, 734 F.Supp.2d 1237, 1252 (M.D.Ala.2010); *Orsak v. Metro. Airports Comm. Airport Police Dep't*, 675 F.Supp.2d 944, 955-956 (D.Minn.2009).

immunity to officer who used his taser twice and his pepper spray once to subdue plaintiff who was not a threat to the officers, not attempting to flee and was driving away at the officer's command).

It is clear that the use of tasers in general is not objectively unreasonable, even where multiple discharges occur. It is not as clear when the use of tasers is objectively unreasonable in a specific context although one could possibly draw some conclusions from the jurisprudence cited. The Fifth Circuit has held that "pre-existing law must dictate, that is truly compel, (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances." Pierce v. Smith,* 117 F.3d 866, 882 (5th Cir. 1997) quoting *Lassiter v. Alabama A&M University* 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc); *Pasco v. Knoblauch* 566 F.3d 572, 578-579 (5th Cir. 2009). (emphasis in original)  In this circuit, as set forth in *Autin,* applying the factors of *Graham v. Connor* found at 490 U.S. 396, the use of a taser may be objectively unreasonable depending on the severity of the crime, whether the actor poses an immediate threat to the safety of the officer or others, whether he is actively resisting arrest or attempting to evade arrest by flight.  *Autin v. City of Baytown,* 174 Fed. Appx. 183, 185 (5th Cir. 2005).  "A reasonable officer is charged with knowing that, as clearly established law, these are the factors that tend to indicate whether the use of force is appropriate." *Id.,* at 186.  However, in the Sixth Circuit, a misdemeanant (jaywalking violation) did not have a clearly established

right not to be tasered in 2008 because he fled. *Cockrell v. City of Cincinnati*, 468 Fed. Appx. 496-498, therefore, the severity of the crime may not be a factor in some parts of the country yet it might be in others.

The severity of the crime at the time was unknown to Guidry beyond the reasonable suspicion of a drug transaction.  Depending upon the drug involved, and the amount involved, the crime could have been a felony or a misdemeanor. Rakestrau could have been in possession of a deadly weapon. In hindsight only, it was learned Rakestrau was in possession of a small amount of marijuana. It was Rakestrau's conduct which escalated events from a request for identification, to Guidry's use of soft hands to gain compliance, and when that failed, to Guidry's use of hard hands.  When that failed, and Rakestrau appeared to be in a state to either fight or flee, Guidry deployed the taser.

Four seconds after the cycle stopped, (1) after having been involved in an altercation with an individual larger than he, (2) who resisted being questioned or searched, (3) who still had not been searched for a weapon (4) whose hands were not visible and (5) with no backup present, Guidry decided to deploy the taser a second time. Guidry testified that Rakestrau moved and his hands were still under him (a fact that is somewhat contradicted by the eyewitnesses). It would not be plain to *every* reasonable officer that the use of the taser again was unlawful under these circumstances *unless* it was clear that Rakestrau was completely subdued, and therefore, not a flight risk, a threat to the safety of Guidry or capable of resisting arrest. This is particularly so given the

-22-

language of the LPSO policy that "additional discharges may be used to gain compliance."  Based on the information available from the video which this Court has viewed numerous times, this Court cannot conclude that none of the *Graham* factors was plainly present. *Autin v. City of Baytown*, 174 Fed. Appx. 186.

While the nine second cycle is troubling to this Court, given the conditions at the moment, when a five second cycle would have been the minimum, this Court cannot say that the additional four seconds, while perhaps constituting excessive force, violated clearly established law such that "every reasonable official would have understood" Guidry's nine second discharge violated Rakestrau's right to be free from excessive force. Therefore, Guidry is entitled to qualified immunity and the claims against him in his individual capacity under 42 U.S.C. § 1983 must be dismissed.

**Louisiana State Law Claims**

The plaintiff has also asserted the Louisiana state law claim of assault and battery against Guidry under La. C.C. art. 2315.  Under this theory, the officer can be liable and the sheriff can be vicariously liable in his official capacity.  *Jenkins v. Jefferson Parish Sheriff's Office*, 402 So.2d 669, 669 (1981); *Riley v. Evangeline Parish Sheriff's Office,* 637 So.2d 395, 395 (1994)*.*  Louisiana's tort of excessive force is essentially the same as its federal counterpart, however, it is analyzed under general negligence law, which employs a duty-risk analysis. *Stroik v. Ponseti,* 96–2897 (La.9/9/97), 699 So.2d 1072, 1077.   As such, plaintiffs must prove: (1) defendant owed a duty of care to plaintiffs; (2) the requisite duty was

breached by defendant; (3) the conduct in question was a cause-in-fact of the resulting harm; and

(4) the risk of harm was within the scope of the protection afforded by the duty breached. *Id.*

Unlike the federal excessive force claim which does not depend on the constitutionality of

an underlying arrest, under Louisiana law:

> A person shall submit peaceably to a lawful arrest. The person making a
> lawful arrest may use reasonable force to effect the arrest and detention, and
> also to overcome any resistance or threatened resistance of the person being
> arrested or detained. La.C.Cr.P.Art. 220.

Thus, absent a valid arrest, any force used to effectuate arrest is excessive and

constitutes a battery. *Deville v. Marcantel,* 567 F.3d 156, 172-173 n.9 (5th Cir. 2009). An

unlawful arrest is one lacking probable cause. *Id.*  The defendant argues, and this Court

agrees, there was enough reasonable suspicion of criminal activity to justify a *Terry* stop.

Whether that rises to the level of probable cause has not been briefed. However, it is not

necessary to decide whether probable cause exists as the standards set forth in  *Kyle v.*

*City of New Orleans*, 353 So.2d 969, 972-973 (1977) to determine the duty owed by

police officers in effectuating an arrest have been held to apply prior to arrest when an

officer approaches a person he has reason to question.  *Mathieu v. Imperial Toy Corp.*,

646 So.2d 318, 322-323 (La. 1994); *Stroik v. Ponseti,* 699 So.2d 1078.

The duty is one of reasonableness under the totality of the circumstances, and to

determine if the duty was breached, i.e. the actions were not reasonable under the

circumstances, the court must consider: (1) the known character of the arrestee; (2) the

risks and dangers faced by the officers; (3) the nature of the offense involved; (4) the

-24-

chance of the arrestee's escape if the particular means are not employed; (5) the existence of alternative methods of arrest; (6) the physical size, strength, and weaponry of the officers as compared to the arrestee; and (7) the exigencies of the moment. *Id., Kyle v. City of New Orleans*, 353 So.2d  973.  The Fifth Circuit has indicated these considerations are sufficiently similar to the *Graham* factors to warrant the same result as would obtain on the § 1983 claim. *Deville v. Marcantel,* 567 F.3d 173,  *Deshotels v. Marshall,* 454 Fed. Appx. 262, 269 (5th Cir. 2011).

Based upon the analysis and discussion set out above in this Court's consideration of the §1983 claims, the motion for summary judgment on plaintiff's state law claims against Guidry for his actions up to and including the first tasing is granted.  However, this Court finds there is a genuine issue of material fact whether the second tasing constituted excessive force if Rakestrau was subdued at the time of the second tasing and not given opportunity to comply. Therefore, this aspect of the motion is denied.

### *Conclusion*

As to the plaintiff's claims under 42 U.S.C. § 1983, the events leading up to and including the first taser discharge do not constitute excessive force. As to the second tasing, there is a genuine issue of material fact whether the force used was excessive. However, the plaintiff has failed to show that the actions of Deputy Guidry violated rights that were clearly established at the time of the incident, and therefore, Deputy Guidry is entitled to qualified immunity and the § 1983 claims against him in his individual

-25-

capacity must be dismissed.

As to the plaintiff's state law claims, for the same reasons applicable to the §1983 claims, the motion is granted as to the events up to and including the first tasing, however the Court finds there are genuine issues of material fact pertaining to the second tasing and the motion is denied as to that claim.

Signed at Lafayette, Louisiana this 8th day of April, 2013.

_____
Patrick J. Hanna
United States Magistrate Judge